# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| BRADFORD STONE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-2770 |
| | § | |
| UNOCAL TERMINATION ALLOWANCE | § | |
| PLAN, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is the motion for summary judgment of the defendants Unocal Termination Allowance Plan, Unocal Employee Redeployment Plan, and Unocal Retirement Plan's (collectively, "Plans").[1]  Dkt. 40.  Having reviewed the motion, the response, the reply, and the applicable law, the court finds that the Administrator and Appeals Committee did not abuse their discretion.  Accordingly, the Plans' motion for summary judgment is GRANTED.

### FACTUAL BACKGROUND

### The Merger

On August 10,  2005, Chevron Corporation ("Chevron") contracted to acquire Unocal Corporation ("Unocal").  Dkt. 40 at 2.  At the time of the merger, Unocal employed Stone as a Senior Staff Machinery Engineer.  Dkt. 23 ¶ 8.  Stone had worked for Unocal since 1988.  Dkt. 45 at 5 n.3.  Once the entities effected the merger, Chevron extended Stone two different job offers.

---

[1] Stone voluntary dismissed Unocal Change of Control Claims and Appeals Process, Chevron Change of Control Administrator, and Chevron Change of Control Appeals Committee.  Dkt. 5 at 1.

Dkt. 40, Ex. A at 23–24; Dkt. 40, Ex. B. Both positions entailed identical compensation packages. Dkt. 40, Ex. A at 24.

Chevron offered Stone base pay that equaled his base pay at Unocal. Dkt. 40 at 2. Additionally, Chevron's Success Sharing program ("CSS") replaced the Annual Incentive Program ("AIP") in which Stone participated during his employment at Unocal. Dkt. 40, Ex. A at 46–47. Under CSS, however, Stone potentially qualified for a target bonus equaling 20% of his base pay. *Id.* Under the AIP, Stone was eligible for a target bonus of 17.5% of his base pay under the AIP. Furthermore, Chevron matched 8% of Stone's 401(k) contributions, compared to Unocal's 6% match. *Id.* at 53. Chevron also recognized Stone's years of service and preserved his Unocal pension benefits. *Id.* at 50. Chevron established a plan equivalent to Unocal's Long Term Incentive Plans ("LTIP")[2] but only offered it to employees with pay grades higher than what was offered Stone.[3] Dkt. 40, Ex. A at 61. Under the LTIP, Stone received discretionary awards of restricted stock and stock options ("LTI") equal to 10% of his base pay. Dkt. 40, Ex. D. To offset this reduction, Chevron provided Stone a continuation bonus equaling 10% of his base pay. Dkt. 40, Ex. B. Stone's eligibility to receive the bonus was contingent on Stone's continual employment through March 1, 2006. *Id.*

Stone accepted a position as Senior Staff Machinery Engineer. Dkt. 40, Ex. B. Stone conditioned his acceptance on a "review of the offer presented which does not appear to include an equivalent benefits and perquisite compensation when compared to those [he] received at Unocal."

---

[2] Unocal provided employees with two separate long term incentive plans: the LTIP of 2004 Restricted Stock Award Agreement and the Nonqualified Stock Option Under the LTIP of 2004. Dkt. 40, Ex. D.

[3] Chevron granted stock options and restricted stock to employees in pay grades 26 and above; Stone had a pay grade of 25. Dkt. 40, Ex. B; Dkt. 40, Ex. D.

*Id.* On October 31, 2005, Stone received a 5% raise in his base pay. Dkt. 40, Ex. A at 42–45.

**Constructive Discharge Policy**

At the time of the merger, the Plans' terms and conditions were in effect and applied to Stone and other Unocal employees. Dkt. 23 ¶ 9. Under the Plans, Unocal employees were entitled to enhanced payouts if, during the two-year period following a change of control, they experienced a "constructive discharge." Dkt. 40 at 4. Chevron's acquisition of Unocal constituted a change of control for purposes of any employee arrangement and for all other company benefit plans. Dkt. 45 at 6. The Unocal Retirement Plan ("URP"), in Article 16.1(E), defined constructive discharge[4] as follows:

> [A]n Employee's resignation of employment with a Participating Company, with a Controlling Entity, or with a Successor Entity within 60 days of the occurrence of any of the following events, provided that such event was initiated by a Participating Company, a Controlling Entity, or a Successor Entity:
>
> (1) A reduction in the Employee's base pay.
>
> (2) A reduction in the Employee's annual incentive target award(s) under an applicable annual cash bonus program in which the Employee participates, which is included as Earnings under Section 1.17 [of the Unocal Retirement Plan].
>
> (3) A reduction in the Employee's eligibility for or amount of benefits available to the Employee under this Article 16, or under the Change of Control Event provisions of any other benefit plan of the Company, or the Employee's annual incentive target amount under the Change of Control Event provisions of any stock-based or annual incentive compensation program of the Company.
>
> (4) A reduction in the benefits or perquisites available to the Eligible Employee or his dependents as of the day immediately before the Change of Control, including without limitation a material increase in the cost to such Eligible Employee or his dependents for such benefits or perquisites. Benefits include, without limitation,

---

[4] After the merger, Chevron issued a Change of Control Benefits Application, which also defined constructive discharge. Dkt. 45, Ex. 6. The constructive discharge provisions varied slightly from the provisions set out in the Unocal Retirement Plan. The parties do not dispute that the definition under Article 16.1(E) of the URP is controlling.

> qualified or nonqualified defined benefit or defined contribution pension benefits; stock-based or annual incentive compensation programs; medical or dental coverages; disability or life insurance; severance benefits; or sick pay, vacation pay, paid holidays, or paid leave of absence allowances. Perquisites include, without limitation, automobile allowances, financial counseling, educational assistance, executive physical examinations, and expatriate income tax preparation services. However, a reduction in benefits or perquisites shall not include a modification of benefits or perquisites which results from a change effected in the ordinary course of business which is applicable to all similarly-situated employees of the Controlling Entity or the Successor Entity and which does not result in a material reduction in the aggregate value of benefits and perquisites available to the Eligible Employee or his/her dependent . . . .

Dkt. 40, Ex. H.

On January 5, 2006, Stone submitted his Constructive Discharge Application to Chevron's Change of Control Administrator ("Administrator"). Dkt. 45, Ex. 8. He amended the application on January 27, 2006. Dkt. 45, Ex. 9. In his application, Stone described several events which he claimed constituted constructive discharge. Dkt. 40, Ex. B. Stone contended that Chevron's job offer eliminated his LTI, resulting in a reduction in benefits under Article 16.1(E)(3) of the URP. *Id.* Stone also asserted that the one-time continuation bonus offered by Chevron was insufficient and, in accord with Article 16.1(E)(3)[5], reduced the benefits previously available to Stone under Unocal's benefit plan. *Id.* Finally, Stone contended that Chevron's offer disregarded his annual lump sum increase ("LSI") payment,[6] resulting in a reduction in base pay and establishing constructive discharge under Article 16.1(E)(1), (2).[7] *Id.* To satisfy eligibility requirements for

---

[5] The Administrator and Appeals Committee analyzed Stone's alleged reduction in benefits under both Article 16.1(E)(3) and (4) of the URP.

[6] Although the record is unclear, LSI appears to be an annual merit increase in base pay provided to Stone by Unocal.

[7] In addition, because Chevron's job offer did not detail the costs of medical benefits, Stone asserted a reduction of benefits under the Constructive Discharge Policy. Dkt. 40, Ex. D. Subsequently, Stone admitted that medical costs did not increase. Dkt. 40, Ex. 1 at 52.

change of control benefits, Stone resigned from his position at Chevron on February 28, 2006. Dkt. 45, Ex. 1 at 20.

**Administrative Review**

On February 24, 2006, in an eight-page written decision, the Administrator denied Stone's claim. *Id.* The Administrator found that the elimination of LTI did not reduce Stone's eligibility for benefits under Article 16.1(E)(3). *Id.* The Administrator noted that under Unocal's LTIP, upon the change of control event, Stone's LTI vested and became immediately exercisable.[8] *Id.* The Administrator also cited a Chevron newsletter informing all Unocal employees that the LTIP change of control provisions had been executed.[9] *Id.* The Administrator equated the execution of these provisions to Stone receiving the benefits for the year 2005, as required by the change of control provisions. *Id.*

The Administrator also found that the elimination of LTI did not materially reduce Stone's benefits as required by Article 16.1(E)(4) of the URP. *Id.* The Administrator explained that a "material reduction in the aggregate value of benefits available" was a prerequisite to eligibility under Article 16.1(E)(4). *Id.* The Administrator then compared the value of benefits to which Stone was entitled the day preceding the change of control and the aggregate value of benefits to which he was entitled the day after the alleged constructive discharge events. *Id.* The Administrator determined that the continuation bonus offered by Chevron offset the elimination of Stone's LTI in

---

[8] Unocal's LTIP of 2004 Restricted Stock Award Agreement stated, "Upon the occurrence of a Change of Control . . . the Recipient shall be entitled to the delivery of all shares which are subject to this award and all restrictions shall lapse." Dkt. 40, Ex. D. Unocal's Nonqualified Stock Option Under the LTIP of 2004 stated, "Upon or . . . immediately prior to but subject to 'Change of Control' . . . each Option will become immediately exercisable." *Id.*

[9] The newsletter stated that the options had been placed in Unocal employees' E*Trade accounts and that the restricted stock had been converted. Dkt. 40, Ex. D.

the present year. *Id.* Thus, the Administrator concluded, Stone did not experience a material reduction in benefits. *Id.* The Administrator declined to speculate about material reductions in future years. *Id.*

Finally, the Administrator found that Stone's LSI loss did not constitute constructive discharge under Article 16.1(E) of the URP. *Id.* The Administrator noted that Stone did not qualify for constructive discharge under Article 16.1(E)(2) because Stone received a higher target bonus under Chevron's cash program. *Id.* The Administrator also found Article 16.1(E)(1) inapplicable to the elimination of LSI because under Unocal's policies LSI did not constitute base pay. *Id.* Lastly, the Administrator found Article 16.1(E)(4) inapplicable. *Id.* The Administrator compared the base pay increase Stone received from Chevron with his LSI loss. *Id.* Because Stone's salary increase exceeded any LSI reduction, the Administrator held that a material reduction did not occur. *Id.*

On April 24, 2006, Stone appealed the Administrator's decision. Dkt. 45, Ex. 12. Stone contended that the Administrator wrongfully denied his claim concerning the elimination of LTI. Dkt. 40, Ex. C. Stone argued that Article 16.1(E)(4) requires the Administrator to account for future losses. *Id.* The Change of Control Appeals Committee ("Appeals Committee") denied Stone's appeal on July 3, 2006. *Id.* The Appeals Committee interpreted the provision to require consideration of potential benefits available the day before the change of control and the day constructive discharge is claimed. *Id.* The Appeals Committee reiterated that any speculative future value of LTI would not be construed when making this comparison. *Id.*

On August 29, 2006, Stone filed suit in this court seeking to overturn the determination of the Administrator and Appeals Committee. Dkt. 40 at 1. Stone alleges that he was unlawfully

denied plan benefits in violation of ERISA, specifically 29 U.S.C. § 1132(a)(1)(B).  Consequently, the Plans then filed the present motion for summary judgment.

### STANDARD OF REVIEW

Summary judgment should be granted if the record, taken as a whole, together with any affidavits, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c); *N.Y. Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25).  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.* at 1075.

If the moving party meets this burden, however, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996).  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.  *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047.  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996). The court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S. Ct. 2505 (1986).

In order to determine whether summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## ANALYSIS

### Standard of Review of the Plan[10]

Pursuant to ERISA § 502(a)(1)(B), Stone contests a denial of benefits by the plan administrator. The court generally reviews decisions of an administrator *de novo* unless the governing plan confers discretionary authority upon the administrator to make benefit determinations or construe the language of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112–13, 109 S. Ct. 948 (1989) (finding these standards consistent with established principles of trust law); *see also Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). In the

---

[10] Stone objects to various affidavit testimony provided by the Plans. Because the court finds sufficient uncontested evidence to support its decision, Stone's objections are DENIED as moot.

8

present case, the Plans provided the Appeals Committee "express and final discretionary authority to interpret and apply Plan provisions and to determine facts in rendering decisions." Dkt. 40, Ex. H.  Because the Plans confer discretionary authority upon the Appeals Committee, its decision should be reviewed under an abuse of discretion standard.  *See Vercher*, 379 F.3d at 226 ("[T]he meaning of plans terms . . . [are] reviewed *de novo* unless there is an express grant of discretionary authority.").

Stone concedes that the Appeals Committee's decision should be reviewed under the abuse of discretion standard.  Dkt. 45 at 14, 25.  However, Stone argues that a "sliding scale" standard, giving less deference to the administrator, should be applied.  *Id.* at 14.  In deciding how much deference to accord the plan administrator, the court may adjust its abuse of discretion review to reflect an administrator's possible conflict of interest.  *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 296 (5th Cir. 1999) (en banc).  Under the Fifth Circuit's "sliding scale" standard, "the deference due to the [administrator's] decision may be reduced in proportion to the conflict [of interest]."  *See Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 356 (5th Cir. 2004) (citing *Vega*, 188 F.3d at 297 ("The existence of a conflict is a factor to be considered in determining whether the administrator abused his discretion in denying a claim.")).  As evidence of a conflict of interest, Stone points out that the Appeals Committee was employed by Chevron.  Dkt. 45 at 14–15.  The mere fact that an employer is also a plan administrator, however, does not suffice to create an inherent conflict of interest.  *MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 479 n.8 (5th Cir. 2003).  Rather, a plaintiff must present additional evidence showing the existence and extent of the conflict.  *Id.*  Generally, this evidence will be found outside the administrative record.  *See Vega*, 188 F.3d at 301 (discussing the conflict of interest based on references to evidence presented from outside the

administrative record); *see also Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 343 n.7 (5th Cir. 2002) (determining the proper level of deference to accord the administrator's decision through an examination of extra-record evidence); *Jez v. Dow Chem. Co.*, 402 F. Supp. 2d 783, 785–86 (S.D. Tex. 2005) (same).[11] In fact, it would be unreasonable, and practically impossible, for a plaintiff to show any degree of conflict through consideration of the record alone. *See Kergosien*, 390 F.3d at 356 ("There is no practical way for the extent of the administrator's conflict of interest to be determined without . . . going beyond the record of the administrator."). Because Stone has failed to proffer any extra-record evidence reflecting a conflict of interest, an abuse of discretion standard of review will be applied to the Appeals Committee's decision. *See MacLachlan*, 350 F.3d at 479 n.8.

### Did Chevron Abuse Its Discretion in Denying Stone's Claims?

In determining whether an administrator abused its discretion in denying a participant's benefit request, the court follows a two-step process. "First the court determines whether the administrator's interpretation of the plan is legally correct." *Abouh-Fetouh v. Employee Benefits Comm.*, 245 F.3d 465, 472 (5th Cir. 2001) (citing *Threadgill v. Prudential Sec. Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998)). "If the court determines that the plan administrator's interpretation of the plan is legally correct, then the administrator's interpretation and the denial of benefits should be upheld because there cannot have been any abuse of discretion." *Id.* "If, on the other hand, the court

---

[11] In *Gooden v. Provident Life & Accident Insurance Co.*, a Fifth Circuit panel held that evidence of an administrator's conflict may not be considered by the district court in its review of the benefit denial. *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333 (5th Cir. 2001); *see also Abate v. Hartford*, 471 F. Supp. 2d 724, 733 (E.D. Tex. 2006). However, this holding directly contradicts the *Vega* court's decision, by an en banc court, which specifically permitted consideration of extra-record evidence to determine the extent of the conflict and the degree of deference appropriate to the administrator's decision. *See Vega*, 188 F.3d at 297 ("The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be."); *accord Lain*, 279 F.3d at 343 n.7.

determines that the plan administrator's interpretation is not legally correct, then the court must proceed to determine whether the administrator's decision denying benefits was an abuse of discretion." *Id.* (citing *Threadgill*, 145 F.3d at 293).

To determine whether the administrator's interpretation of the plan was legally correct, the court must consider: (1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. *See Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 637–38 (5th Cir. 1992).

If, after reviewing these factors, the court finds the administrator's interpretation incorrect, the court's inquiry continues. Consequently, the propriety of the administrator's use of discretion depends on: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith. *Id.*; *see also Batchelor v. Int'l Bhd. of Elec. Workers Local 861 Pension & Ret. Fund*, 877 F.2d 441, 445–48 (5th Cir. 1989). On rare occasions, the court can avoid a full-fledged two-step analysis "if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language." *See Gosselink v. AT&T, Inc.*, 272 F.3d 722, 727 (5th Cir. 2001); *see also Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307–08 & n.3 (5th Cir. 1994) ([T]he reviewing court is not rigidly confined to [*Wildbur*'s] two-step analysis in every case."). This exception prevents "'the anomalous finding that a Plan administrator's interpretation which directly violates the plain meaning of the plan language is not an abuse of discretion simply because the plan language has always been interpreted in the same

manner and there are no inferences of bad faith.'" *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 633 (5th Cir. 2004) (quoting *Gosselink*, 272 F.3d at 727).

### Uniform Construction of Article 16.1(E)

The Administrator held, and the Appeals Committee affirmed, that Stone's continuation bonus offset the elimination of his LTI. Thus, because his continuation bonus at least equaled his target 2006 LTI, Stone did not suffer a material reduction in benefits, or constructive discharge, under Article 16.1(E)(4) of the URP. The Administrator and Appeals Committee uniformly applied this reasoning to all Unocal employees who lost their LTI after Chevron's change of control. Forty-nine Unocal employees filed for constructive discharge because of the elimination of their LTI. The Administrator denied all forty-nine claims. In each instance, the Administrator explained that Article 16.1(E)(4) did not apply because the employee did not experience a material reduction in the aggregate value of benefits. Twenty-two employees appealed the Administrator's findings. The Appeals Committee affirmed eighteen decisions and reversed four decisions.

Stone contends that the Appeals Committee's reversals are inconsistent with other administrative rulings. Yet, the Appeals Committee applied the same rationale as the Administrator applied in denying Stone's constructive discharge claim under Article 16.1(E)(4). The Appeals Committee examined whether the continuation bonus offset any loss in LTI in the current year. In two of the four reversals, the applicant's offers from Chevron included *no* continuation bonus. In the other two instances, Chevron offered a lesser continuation bonus than the LTI eliminated pursuant to the change of control provisions. The Appeals Committee, accordingly, found that the four applicants had suffered a material reduction in the aggregate value of their benefits.

Therefore, the court finds that the Administrator and Appeals Committee uniformly applied Article 16.1(E)(4) of the URP to Unocal employees' reduction of LTI.[12]

### Fair Reading of Article 16.1(E)

The court next considers whether the Administrator and Appeals Committee's construction was consistent with a fair reading of Article 16.1(E) of the URP. To determine whether a plan administrator's reading of a provision is a "fair . . . and reasonable one," *Lowry v. Bankers Life & Cas. Ret. Plan*, 865 F.2d 692, 694 (5th Cir. 1989), the court must interpret the ERISA plan in an ordinary and popular sense as a person of average reason and intelligence, or in the same manner as the average plan participant. *See Tucker v. Shreveport Transit Mgmt., Inc.*, 226 F.3d 394, 398 (5th Cir. 2000) (internal quotation marks omitted); *see also Giunta v. Mobil Corp. Employee Severance Plan*, 205 F. Supp. 2d 715, 724 (S.D. Tex. 2002). Stone asserts that his loss of LTI should have constituted a constructive discharge event under a plain reading of Article 16.1(E)(3) of the URP.

---

[12] In attempting to show a reduction of benefits under Article 16.1(E)(1) of the URP, Stone contrasts the administrative decisions regarding low-wage earners with employees who suffered an elimination of LTI. The record reflects that some Unocal employees were paid twenty-five to thirty dollars per hour for travel to and from their offshore work locations. Chevron paid these workers only eighteen dollars per hour. Thirty-seven Unocal employees applied for constructive discharge seeking change of control benefits. Finding the pay decrease to be a reduction in base pay, the Administrator, pursuant to Article 16.1(E) of the URP, granted the constructive discharge claims. Because Stone did not qualify for constructive discharge under Article 16.1(E)(1), Stone argues that he was treated differently than these applicants; thus, the Administrator's actions provide evidence of a lack of uniform construction. Stone's contention, however, lacks merit. The Administrator uniformly construed the elimination of LTI as a non-wage benefit.
   Stone also contends that the Administrator and Appeals Committee applied Article 16.1(E) inconsistently, particularly in light of Unocal's low-wage earners' constructive discharge claims. For reasons explained in this opinion, the court finds that the Appeals Committee's interpretation of Article 16.1(E) is legally correct; therefore, whether the Plan is internally consistent is irrelevant. *See Abouh-Fetouh*, 245 F.3d at 472 ("If the court determines that the plan administrator's interpretation of the plan is legally correct, then the administrator's interpretation and the denial of benefits should be upheld because there cannot have been any abuse of discretion."); *see also Wildbur*, 974 F.2d at 637–38 (same). Regardless, the court does not believe the Administrator or Appeals Committee applied Article 16.1(E) inconsistently. In his deposition, Stone acknowledges that travel costs are considered employee wages. Stone never makes a similar acknowledgment with regard to the loss of LTI. Moreover, Stone admits that his base pay at Chevron was $7,000 higher that it had been at Unocal. Because Stone's position differs entirely from that of low-wage earners, the Administrator and Appeals Committee did not inconsistently interpret Article 16.1(E) of the URP.

The Administrator and Appeals Committee found otherwise. Article 16.1(E)(3) defines constructive discharge as:

> A reduction in the Employee's eligibility for or amount of benefits available to the Employee *under this Article 16*, or *under the Change of Control Event provisions* of any other benefit plan of the Company, or the Employee's annual incentive target amount *under the Change of Control Event provisions* of any stock-based or annual incentive compensation program of the Company.

Dkt. 40, Ex. H (emphasis added). As the plain language indicates, Article 16.1(E)(3) is limited specifically to reductions in change of control benefits.[13] The LTIP's change of control provisions vested all stock options and removed all restrictions from restricted stock upon the merger event. Contrary to Stone's assertions, the change of control provisions did not provide for the continuation of LTI. Thus, because Stone's change of control benefits were not reduced as a result of his loss of LTI, the decisions of the Administrator and Appeals Committee were consistent with the fair reading of Article 16.1(E)(3).

Stone also alleges that the Administrator and Appeals Committee improperly applied the "material change" requirement to all provisions under Article 16.1(E) of the URP. However, Stone provides no support for his assertion. In fact, the Administrator and Appeals Committee only applied the material change requirement in the context of Article 16.1(E)(4). Under this provision,

---

[13] Stone's interpretation of Article 16.1(E)(3) is inconsistent with a fair reading of the provision. In his response, Stones states that an employee is constructively discharged, pursuant to Article 16.1(E)(3), if the employee suffers:

> [A] reduction in the Employee's eligibility for *or* amount of benefits to the Employees under this Article 16, *or* under the Change of Control provisions of any other benefit plan of the Company, *or* the Employee's annual incentive target amount under the Change of Control Event provisions of any stock-based *or* annual incentive compensation program of the Company.

Dkt. 45 at 16–17 (emphasis in original). Stone argues that an employee is constructively discharged if that employee suffers "[1] a reduction in the Employee's eligibility for [benefits available to the employees] or [2] [a reduction in the] amount of benefits available to the Employees . . . under Article 16. . . ." However, by inserting commas within the provision, the Plans clearly indicate that such reductions in employee eligibility for or amount of benefits must be incorporated within Article 16 or change of control provisions.

"a modification of benefits . . . which results from a change effected in the ordinary course of business [that] is applicable to all similarly situated employees" must be material to be considered a constructive discharge event. In this case, Stone and all Unocal employees under a certain grade level suffered an elimination of LTI; thus, Chevron's actions affected all similarly-situated employees. By finding that Stone did not suffer a material reduction in benefits, the decisions of the Administrator and Appeals Committee to deny Stone's claim under Article 16.1(E)(4) of the URP were consistent with a fair reading of Article 16.1(E).

Finally, Stone claims that the Administrator and Appeals Committee ignored the elimination of LTI in future years.[14] Both the Administrator and Appeals Committee, however, address future LTI earnings in their administrative decisions. As reflected in each opinion, the Administrator and Appeals Committee recognized the loss of future LTI. While both chose not to consider speculative future losses, nothing prevented Stone from bringing a constructive discharge claim once the alleged losses materialized.[15] The decisions of the Administrator and Appeals Committee not to include in the current constructive discharge event possible future losses resulting from the elimination of LTI were not contrary to a fair reading of Article 16.1(E).[16]

After resolving each of the relevant factors in favor of the Plans, the court finds that the Administrator and Appeals Committee gave a legally correct interpretation of the plan provisions in question. This finding pretermits "any need to consider whether a legally incorrect interpretation

---

[14] In his complaint, Stone claims that he never received a continuation bonus or a lump sum increase. Neither claim, however, was raised in the administrative appeal.

[15] According to the Appeals Committee, once Stone's 2007 loss materialized, he would still be eligible to claim constructive discharge under the change of control provisions because the 24-month time bar would not yet have run.

[16] Because neither party addresses the third prong of the correct interpretation analysis, the court does not address this factor.

of the [administrator] was not an abuse of discretion."[17]  *Ellis v. Liberty Life Assurance Co.* , 394 F.3d 262, 270.  Stone's § 1132(a)(1) claims for benefits fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the court GRANTS the Plans' motion for summary judgment.  The case is DISMISSED.[18]

Signed at Houston, Texas on March 14, 2008.

_____
Gray H. Miller
United States District Judge

---

[17]  Even if the court assumes, for the sake of argument, that the decisions of the Administrator and Appeals Committee were legally incorrect, the court would not hold that either abused its discretion.  Under the abuse of discretion standard, three factors are relevant: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith.  *Wildbur*, 974 F.2d at 637–38.  As the court's evaluation of the Administrator and Appeals Committee makes clear, their construction was logical in the context of Article 16.1(E) of the URP.  Thus, the first *Wildbur* factor—the internal consistency of the plan under the administrator's interpretation–weighs in the Plans favor.  Neither party has drawn the court's attention to any relevant regulations formulated by relevant agencies.  Moreover, Stone's evidence does not raise any inferences of bad faith—the third *Wildbur* factor.  In sum, concluding that all three factors would weigh in the Plans' favor, the court does not find that either the Administrator or Appeals Committee abused its discretion in denying Stone's claim.

[18]  Because Stone fails to differentiate his entitlements under the Termination Allowance Plan from entitlements due under the URP, the court finds that his claims under TAP were correctly denied.  Furthermore, because Stone admits that no benefits are due him under the Employee Redeployment Plan, his ERP-related claims also were correctly denied.